**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| EILEEN GILLESPIE, | ) |
| Plaintiff, Individually and on Behalf of a | ) |
| Class, | ) |
| | ) |
| v. | ) |
| | ) |
| TRAVELSCAPE LLC, EXPEDIA, INC., | ) |
| HOTELS.COM LP; TRAVELOCITY.COM LP, | ) |
| SABRE HOLDINGS CORPORATION, | ) |
| PRICELINE.COM INCORPORATED, | ) |
| BOOKING.COM B.V., BOOKING.COM (USA), | ) |
| INC., ORBITZ WORLDWIDE INC., | ) |
| HILTON WORLDWIDE INC., STARWOOD | ) |
| HOTELS & RESORTS WORLDWIDE, INC., | ) |
| MARRIOTT INTERNATIONAL, INC., TRUMP | ) |
| INTERNATIONAL HOTELS MANAGEMENT, | ) |
| LLC, KIMPTON HOTEL & RESTAURANT | ) |
| GROUP, LLC, INTERCONTINENTAL HOTELS | ) |
| GROUP RESOURCES, INC., | ) |
| and JOHN DOES 1-100, | ) |
| | ) |
| Defendants. | ) |

**CLASS ACTION COMPLAINT**

**I. INTRODUCTION**

1.     Defendant Travelscape LLC (Travelscape) is involved in anti-competitive and unfair business practices that result in room rate overcharges and imposition of unfair and deceptive "tax recovery charges" upon hotel consumers.

2.     Defendant Travelscape is involved in an anti-competitive minimum resale price maintenance ("RPM") scheme involving Defendants Expedia, Inc. ("Expedia"), Hotels.com LP ("Hotels.com"), Travelocity.com LP ("Travelocity"), Sabre Holdings Corporation ("Sabre Holdings"), Booking.com B.V., Booking.com (USA), Inc. (Booking.com B.V. and Booking.com (USA), Inc. will be referred to as "Booking.com"),

and Priceline.com, Inc. ("Priceline"), Orbitz Worldwide, Inc. ("Orbitz") (collectively, "Travel Retailers or the Online Retailer Defendants"), and Hilton Worldwide, Inc. ("Hilton"); Marriott International, Inc. ("Marriott"); Trump International Hotels Management, LLC, ("Trump"); Intercontinental Hotels Group Resources Inc. ("Intercontinental"), Starwood Hotels &Resorts Worldwide, Inc. ("Starwood"), and Kimpton Hotel &Restaurant Group, LLC ("Kimpton") (collectively, "Hotels or Hotel Defendants").

3.      Defendant Travelscape is a travel distribution service owned by Expedia. Travelscape pre-negotiates certain room rates with hotels.  Travelscape is a registered seller of travel in states including in California with registration number: 2083930-50; in Florida with registration number: ST36407; in Iowa with registration number: 677; in Nevada with registration number: 20020759 and in Washington registration number: 602-617-174. Since 1999, Travelscape has had preferred-rate agreements with Doubletree, Hyatt, Marriott, and Westin locations in over 52 US cities plus international cities, including London, Paris, and Rome.

4.      On August 14, 2012, Travelscape sold and booked a reservation for a hotel room for the Marriott Philadelphia Airport for the night of August 20, 2012 to Plaintiff Eileen Gillespie. The agreement was governed by the laws of the State of Washington, USA.

5.      Travelscape made a charge for a total of $354.08 consisting of $299.00 for the Room Rate and $55.08 for Tax Recovery Charges and Service Fees.

6.      Travelscape did not disclose to Plaintiff Eileen Gillespie that Travelscape kept part of the $55.08 Tax Recovery Charges and Service Fees as profit above costs of services and taxes.

7.      Travelscape did not disclose to Plaintiff Eileen Gillespie that she was being overcharged on the room rate as a result of anti-competitive conspiracy in force between hotel chains including Marriott and travel agents including Expedia and Travelscape that involved minimum resale price maintenance ("RPM") agreements.

8.      Travelscape did not disclose that Expedia settled a class action lawsuit for over $120,000,000 relating to unfair Tax Recovery Charges and Service Fees in 2009.

9.      Plaintiff Eileen Gillespie brings this action against Defendant Travelscape to remedy its unfair practices of overcharging consumers for Travel Recovery Charges and Service Fees and against Travelscape and Co-Defendants for overcharging Plaintiff and other consumers on room rate due to anticompetitive price-fixing conspiracy between Travel Retailers and Hotels.

## II. NATURE OF ACTION

10.      Defendants entered into a conspiracy to enter into, fix, raise, stabilize, maintain and/or enforce minimum price maintenance ("PM") agreements in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1,and under Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a).

11.      Expedia along with other Online Travel Retailers dominate and control the market for Hotel Reservations in Nevada and throughout the United States. Online Travel Retailers conspired with the Hotel chains and unlawfully agreed to impose a PM scheme that would fix and maintain the retail price for hotel room reservations based

upon a fixed structure and retail price for room reservations (hereinafter "Rack Rates" or "Rack-Rate Structure"). They agreed to restrict and restrain competition for hotel room reservations pursuant to Travel Retailer-Hotel Agreements in the market for online reservations. They have used Travel Retailer-HotelAgreements to set, fix, and maintain minimum prices at the Rack Rates. The Agreements between the Online Travel Retailers and Hotels provides that room reservations will not be sold for less than the Rack Rate. The Agreements restrain price competition by requiring the Hotel Defendants to set and also enforce minimum price maintenance agreements with respect to attempted price-cutting by competing OnlineTravel Retailers, and/or to prevent price-cutting and discounting of room reservations and to prevent any party from engaging in conduct which would result in the profit-lowering effects of retail price competition for hotel room reservations.

12.     Pursuant to the Travel Retailer-Hotel Agreements, the Hotels agreed to and did in fact enforce the PM scheme against any Online Travel Retailers that competed or attempted to compete with the named Online Travel Retailer with respect to price. Further, they were part of an anti-competitive scheme pursuant to which the Online Travel Retailer utilized their substantial market power and dominance to unlawfully conspire with the Hotels to, inter alia, impose and implement minimum resale price maintenance agreements; enforce the Agreements; refuse to supply or cut off supply to competing price-cutting Online Travel Retailers; and otherwise engage in the other anticompetitive conduct specified herein; all in violation of Section 1 of the Sherman Act, Sections 4 and 16 of the Clayton Act.

13.     Travel Retailers and Hotels conspired and colluded by engaging in extreme measures to ensure that the room rates will be the same or constant for the same product in all distribution channels. They set a price point and created a base floor below which they could not sell hotel rooms.

14.     As a result of the concerted RPM scheme designated and implemented by the Travel Retailers and the Hotels, room reservations were not to be sold to consumers for less than the Rack Rate. They agreed not to compete with any of the other Online Travel Retailers on price, and the retail rates for hotel room reservations were set at the Rack Rates. The Agreements are the product of a centralized conspiracy resulting in consumers paying artificially inflated prices for hotel rooms.

15.     Moreover, the Online Travel Retailer Defendants' advertised "best price guarantees" are nothing more than an illusion for their conspiracy to fix prices, such that the Online Travel Retailers do not have to compete on price but can offer the "best price" to their customers knowing that all of the Online Travel Retailers will offer the same anti-competitive fixed price. Accordingly, in reality, there is no "so-called" "best price" but instead there is an unlawful fixed artificially inflated uniform price and price structure. The mass-marketed term "best price guarantee" is a proxy for the guaranteed fixed price.  A group of top executives for Defendants, that may include but is not limited to Paul Brown, use the "memes" of "best price guarantee" and "parity" for price among distribution channels to train hotel revenue managers to enforce the fixed price desired by Defendants and warn third-party agents that price discounts will be punished through commercial retaliation.

16.     Absent the anti-competitive and deceptive conduct, consumers would have paid less for each of the room reservations purchased. The direct consequence of the unlawful conduct was that consumers paid overcharges on their purchases of room reservations tin violation of Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and for violations of Section 1 of the Sherman AntitrustAct, 15 U.S.C. § 1.

17.     As a result of the conspiracy, consumers paid artificially-inflated prices for hotel rooms and sustained related damages arising from their inability to purchase rooms in a free and open market based upon lawful competition. Accordingly, consumers have paid supra-competitive prices.

18.     Expedia has also been involved with unfair sales practices involving bundled tax and service charges.  Third party travel agents, or travel distribution services, such as Expedia, do not pay taxes on the rate at which consumers pay for hotel rooms at a Consumer Rate. However, Expedia calculates and charges taxes to the consumer on the Consumer Rate, and fails to disclose to consumers that it keeps the spread between the amount of the legitimate taxes owed to the taxing authority and the amount it receives from the consumer as a profit not as a compensation for bona fide services.

19.     Moreover, Expedia structured its invoices for the purpose of implying that taxes are required to be calculated on the Consumer Rate. When a customer paid for a hotel room through Expedia's website, www.Expedia.com, he/she was automatically assessed a "Taxes & service fees" charge. Specifically, Expedia combined "Taxes & service fees" into one line item on a consumer's bill in order to obscure what purported service fees were kept by Expedia and what legitimate taxes were collected and sent to

local authorities. This "Taxes & service fees" charge was in excess of any legitimate taxes or legitimate fees associated with the Wholesale Rate. The "Taxes that Expedia levied against customers are in amounts neither required by, nor tendered to, local or state taxing authorities, and are not directly related to the taxes actually associated with the Wholesale Rate not the Consumer Rate.

20.     Because Expedia did not specifically allocate or designate any particular portion of the charges under "Taxes & service fees" for any purpose, Expedia was able to charge excessive "Taxes & service fees", which are neither legitimate nor necessary. Instead, Expedia has created an additional source of profit, while simultaneously obscuring the true nature of the "Taxes & service fees" in violation of RCW 19.86.020.

21.     Expedia's unfair practice of charging Tax Recovery Charges and Service Fees was the subject of a class action entitled In re Expedia Hotel Taxes and Fees Litigation, 05-2-02060-1, Superior Court of Washington, Kings County.

22.     In 2009, Expedia settled the case and paid approximately $133,415,000.

23.     Despite the Expedia class action and subsequent settlement, Travelscape is engaging in the same unfair business practice of charging for bundled Tax Recovery Charges and Service Fees.

24.     Travelscape's practice of charging for bundled Tax Recovery Charges and Service Fees is unfair, deceptive and unconscionable. If a customer books a hotel reservation, Travelscape charges the customer's credit card for the transaction. Unless the customer purchases additional guests services while staying at the hotel (i.e. room service, movie rentals, or valet parking), the customer pays no money to the hotel for her stay. After the customer checks out of the hotel, the hotel invoices Travelscape for

the net room rate as well as sales tax owed by the hotel. Travelscape then remits the net room rate and tax recovery charge to the hotel. Travelscape retains the facilitation and service fees and does not pay sales tax on these fees. See *Travelscape, LLC v. S.C. Dep't of Revenue*, 391 S.C. 89 (S.C. 2011).

25.    Travelscape LLC is part of the "Expedia Companies".

26.    For example, in connection with the spin-off of TripAdvisor, certain TripAdvisor subsidiaries and certain Expedia subsidiaries entered into a Master Advertising Agreement (CPC). Such Master Advertising Agreement (CPC), dated as of December 20, 2011, was entered into by TripAdvisor LLC, TripAdvisor Limited, and TripAdvisor Singapore Private Limited (collectively, the "TripAdvisor Companies") and, on the other by Expedia, Inc., Hotels.com LP, and Travelscape LLC (collectively, the "Expedia Companies"). Under this agreement, the Expedia Companies continue purchasing click-based advertising, primarily in connection with the "check rates" feature on TripAdvisor websites, from TripAdvisor. The pricing for such advertising will be on a cost-per-click or revenue-share basis.  This activity demonstrates coordination between Expedia and Travelscape with respect to price strategy and implementation.

27.    Travelscape is an wholly-owned subsidiary of Expedia. Expedia uses Expert Searching and Pricing (ESP) technology. Evidence suggests that Defendant Travelscape is part of the above-described conspiracy with the Hotel Retailers and Hotels involving Expedia and that Travelscape uses the same unlawful pricing as Expedia with respect to hotel room rates. Plaintiff will likely have evidentiary support after a reasonable opportunity for further investigation or discovery for these claims.

**III. PARTIES**

28.     Eileen Gillespie at all times relevant hereto has been a resident of Park Ridge and citizen of Illinois. During the Class Period, Plaintiff reserved and rented a hotel room through Travelscape for a Marriott Hotel room and was charged a bundled Tax Recovery Charge and Service Fee.

29.     Travelscape LLC is a Nevada LLC with its principal place of business in Las Vegas, Nevada.

30.     Defendant Expedia, Inc. is a Delaware corporation with its principal place of business at 333 108th Avenue NE, Bellevue, Washington 98004.

31.     Defendant Hotels.com LP is an affiliate of Expedia. Hotels.com LP is a Texas limited partnership with its headquarters located at 10440 North Central Expressway, Suite 400, Dallas, Texas 75231.

32.     Defendant Travelocity.com LP is a Delaware limited partnership with its principal place of business located at 3150 Sabre Drive, Southlake, Texas 76092. Travelocity is owned by Defendant Sabre.

33.     Defendant Booking.com B.V. is a company based in Amsterdam, the Netherlands, with its principal place of business at Herengracht 597, 1017 CE, Amsterdam, Netherlands. Booking.com B.V. owns and operates Booking.com, the leading worldwide online Room Reservations agency by room nights sold, attracting over 30 million unique visitors each month via the Internet from both leisure and business markets worldwide. Booking.com B.V. is a wholly owned subsidiary of Priceline.com Incorporated.

34.     Defendant Booking.com (USA), Inc. is a Delaware corporation with its primary place of business located at 100 William Street, Suite 750, New York, New York

10038. Booking.com (USA), Inc. is a wholly owned subsidiary of Priceline.com Incorporated.

35.     Defendant Priceline.com Incorporated is a Delaware corporation with its primary place of business located at 800 Connecticut Avenue, Norwalk, Connecticut 06854.

36.     Defendant Orbitz Worldwide, Inc. is a Delaware corporation and its corporate headquarters are located at 500 W. Madison Street, Suite 1000, Chicago, Illinois 60661.

37.     Defendant Sabre Holding Corporation, incorporated in Delaware, is headquartered at 3150 Sabre Drive, Southlake, Texas 76092.

38.     Defendant Intercontinental Hotels Group Resources, Inc. is a Delaware corporation with its primary place of business located at 3 Ravinia Drive, Suite 100, Atlanta, Georgia.

39.     Defendant Starwood Hotels &Resorts Worldwide, Inc. is a Maryland corporation with its principal place of business at One StarPoint, Stamford, Connecticut 06902. Starwood's hotels are primarily operated under the brand names St. Regis®, The Luxury Collection®, Sheraton®, Westin®, W®, Le Méridien®, Four Points® by Sheraton, Aloft®and Element®.

40.     Defendant Marriott International, Inc. is a Delaware corporation with its principal place of business at 10400 Fernwood Road, Bethesda, Maryland.

41.      Defendant Trump International Hotels Management, LLC, doing business as The Trump Hotel Collection, is a Delaware limited liability company headquartered at 725 Fifth Avenue, New York, New York 10022.

42.     Defendant Hilton Worldwide, Inc. is a Delaware company doing business as Hilton Hotels &Resorts with its primary place of business located at 7930 Jones Branch Drive, McLean, Virginia.

43.     Defendant Kimpton Hotel &Restaurant Group, LLC is a Delaware limited liability company with its principal place of business located at 222 Kearny Street, Suite 200, San Francisco, CA 94108.

## IV.  JURISDICTION AND VENUE

44.     Federal question jurisdiction exists in that this action arises under Section 1 of the Sherman Act and pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), and 26, and 28 U.S.C. §§ 1331 and 1337. There is supplemental jurisdiction over the Washington Consumer Protection Act and jurisdiction under the Class Action Fairness Act because there are more than 100 class members with different state citizenship and the amount in controversy exceeds $5,000,000.

45.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that Defendant Travelscape LLC and all Defendants are doing business in this judicial district.

## V.  SUBSTANTIVE ALLEGATIONS

46.     According to Expedia, it is the "world's leading online travel service and the fourth largest travel agency in the U.S." Consumers supposedly can search discount rates at more than 8,000 hotels in over 3,000 destinations. According to Expedia's 2004 Annual Report, Expedia acts as an intermediary between suppliers and consumers.

47.     When purchasing a hotel room using Expedia's online service, a customer, like Plaintiff, is given a price quote for a room in a particular city or town. If a

customer chooses to book a room, Expedia then notified the customer that there is an additional charge for "Taxes & service fees." Nowhere in Expedia's reservation notices or invoices was the nature of the service fees or the actual tax due explained to customers. Instead, Expedia willfully intended to deceive and omit material facts by leading its customers to believe that the alleged "taxes" are required to be collected by Expedia and thereafter will be remitted in full to the taxing authority.

48.     Expedia, however, failed to remit all the amounts collected as alleged taxes to the taxing authorities, and instead wrongfully retain the un-remitted "tax" for themselves. According to Expedia's Form 10-Q for the period ending, November 9, 2004, it "does not pay occupancy tax on hotel customer payments that it retains for the intermediary services it provides in connection with its merchant hotel business."

49.     The mark-up by on-line retailers, such as Expedia, typically exceeds the actual room tax by at least 1% to 3%. While local municipalities or counties typically impose a transient occupancy or room tax on charges for hotel accommodations, no taxing authority has approved the practice of allowing a travel distribution service to mark-up the "taxes" and retain the spread. In fact, at least one local taxing authority has filed suit against Expedia and others to halt this practice. See "L.A. Sues Web Hotel Bookers for Pocketing Room Tax,"www.reuters.com (Jan. 3, 2005).

50.     In addition to a failure to disclose or explain the "taxes", there was also no disclosure or explanation of the amount or purpose of the "fees." Expedia willfully failed to describe or quantify the amount of "fees" charged per transaction on its invoices. Thus, by lumping together "Taxes & service fees," Expedia created a misleading impression that the fees are a required charge.

51.     These "fees" are purportedly to cover the costs incurred in servicing the hotel reservations but in truth were for profit.

52.     Expedia took steps to conceal the true nature and amount of these fees from consumers. As set forth above, not only is there no detail or break-out of the "Taxes & service fees" line item on a customer's bill, Expedia has concealed the true nature of the fees on its website.

53.     At the home page for www.Expedia.com. a link appears in approximately 7.5 pt font that states: "Expedia. Inc. terms of use" When the customer clicks on the link, he/she finds a 6-page, single-spaced document entitled "Expedia, Inc. Web Site Terms, Conditions and Notices" ("Web Site Terms"). There is absolutely no discussion or explanation of the "Taxes & service fees" charge for hotel bills.

54.     Expedia did admit on page three of its web Site Terms that it may keep the difference between the taxes that it recovers from the customer and the taxes that it remits to the hotel. Under the heading "Tax Recovery Charge," Expedia states, in part: The tax charge on Expedia Special Rate hotel transactions is a recovery of all applicable transaction taxes (e.g. sales and use, occupancy, room tax, excise tax, value added tax, etc) that Expedia Travel pays to the vendors (e.g., hotels, etc.) in connection with your travel arrangements.

* * *

Expedia Travel's actual tax cost paid to the vendor may vary from the tax recovery charge, depending on the rates, taxability, etc. in effect at the time of the actual use of the hotel, automobile, etc. by our customer.

55.     Moreover, Expedia defines "Service Fee", stating "[t]hese fees cover the costs incurred by Expedia Travel in servicing your travel reservation."

56.     However, there is no explanation or direction of how a customer can determine what portion of the "Taxes and service fees" line item on their bill is attributable to (i) actual taxes remitted to the government; (ii) that portion of the Tax Recovery Charge kept by Expedia; or (iii) the purported Service Fees. Expedia's failure to disclose the true nature of the "Taxes & service fees" was a violation of the Washington  Consumer Protection Act.

57.     Travelscape like Expedia charges an unfair, deceptive and unconscionable bundled Tax Recovery Charges and Service Fees.

58.     Travelscape also fails to provide an explanation or direction of how a customer can determine what portion of the "Taxes and service fees" line item on their bill is attributable to (i) actual taxes remitted to the government; (ii) that portion of the Tax Recovery Charge kept by Expedia; or (iii) the purported Service Fees. Travelscape's failure to disclose the true nature of the "Taxes & service fees" is a violation of the Washington Consumer Protection Act.

59.     As recently as 1997, the concept of an "internet travel company" or Online Retailer — an entity organized to effectuate travel plans, reservations and purchases via the worldwide web — was virtually unknown. In recent years, the internet travel industry has seen explosive growth. By some estimates, more than half of all hotel bookings in the United States are made online, many through internet travel companies owned by the Online Retailer Defendants.

60.     Through their web portals, the Online Retailer Defendants allow consumers to rent hotel rooms in many different hotels throughout the country and the world. These companies offer their services to Hotel Defendants and consumers through several different business models, including the "Agency Model," the "Merchant Model," and/or the "Wholesale Model."

61.     Under the Agency Model, Online Retailers charge a "service fee" to hotel operators on a transaction basis for booking customers into rooms at a given hotel and the consumer pays the hotel for the room directly. Under the Agency Model, the hotels should be setting — and the Online Retailers should be requiring — a competitive price for Room Reservations to increase business and compete against other Online Retailers offering the same service.

62.     Under the Merchant Model, the Online Retailers do not function merely as service providers collecting a fixed transaction fee from the hotels. Rather, the Merchant Model consists of two independent but related transactions whereby an internet travel company: (i)first purchases and takes title to inventories of hotel rooms at negotiated rates from the Hotel Defendants ("wholesale" rates); and (ii) then re-sells the rooms to consumers at higher retail, keeping the difference as profit. Under this Merchant Model, the Online Retailers should be competing on price by increasing or decreasing the margin added to the wholesale rates to set the retail rate.

63.     The third model is the "Wholesale Model," whereby smaller price-cutting Online Retailers obtain access to rooms through wholesalers. Wholesalers, or intermediaries between the Online Retailers and the hotels, work directly with Hotel Defendants to obtain last minute blocks of rooms that need to be filled. The wholesalers

then make those rooms available to smaller Online Retailers at a wholesale rate. The Online Retailers then, like in the Merchant Model, re-sell the rooms to consumers at higher retail, keeping the difference as profit. Under this Wholesale Model, the Online Retailers should also be competing on price by increasing or decreasing the margin added to the wholesale rates to set the retail rate.

64.     From January 1, 2005 through the present date, the internet travel industry has seen explosive growth. Estimates indicate that between one-third and one-half of all hotel bookings in the United States are made online, many through internet travel companies owned by the Travel Retailers including Defendant Travelscape and its parent Expedia.

65.     Through their web sites and call centers, the Travel Retailer Defendants solicit and allow consumers to rent hotel rooms in many different hotels throughout the country and the world. These companies offer their services to Hotel Defendants and consumers through a pre-set uniform structure consisting of common business models

66.     Travel Retailers charge a "service fee" to hotel operators on a transaction basis for booking customers into rooms at a given hotel when the class member pays the hotel for the room directly. If open and free competition existed, the hotels should be setting and the Travel Retailers should be requiring a competitive price for Room Reservations to increase business and compete against other Online Travel Retailers offering the same service.

67.     Online Travel Retailers also operate by first purchasing and taking title to inventories of hotel rooms at negotiated rates from the Hotel Defendants ("wholesale" rates); and then re-selling the rooms to consumers at higher retail rates keeping the

difference as profit.Contrary to lawful competitive practices, the Online Travel Retailers are not competing on price.

68.     The Travel Retailers have gained a dominant presence in the sale of Room Reservations. The Travel Retailers now hold more than 50 percent market share in the internet travel business market. The Travel Retailers have become increasingly important to the Hotel Defendants' business by generating as much as one-half of the Hotel Defendants' Room Reservation traffic. Accordingly, the Hotels believe that they need access to the Travel Retailer Defendants' distribution network.

69.     As a result of their dominance, and knowing that the Hotels cannot afford to lose access to their distribution network, the Travel Retailers devised an illegal PM scheme to prevent new or more efficient internet retailers and other parties from competing and lowering room rates. They exacted agreements from the Hotel Defendants that desired to sell room reservations through the Travel Retailers which even imposed a penalty of termination as a condition of doing business with other competing Travel Retailers such that they were able to ensure that competing Online Travel Retailers refrained from discounting prices below the Rack Rate.

70.     The Defendants and their authorized agents have implemented their conspiracy through the extensive use of interstate mails and wires. They have also convened throughout the United States in meetings and conferences to implement their scheme.  Defendants have implemented their scheme at Eye for Travel's Travel Distribution NorthAmerica Summits, a leading strategic and networking forum for Senior Online Travel andHospitality executives at which Defendants continued to set, plan, fix, and maintain the agreed upon conspiracy.

71.     Major executives in charge of pricing flow from retailer to hotel positions. For example, Paul Brown was President of Partner Services Group and Expedia North America.  Paul Brown lead both Expedia´s global Partner Services Group (PSG) and Expedia North America.  As the president of PSG, Brown was responsible for managing supplier relationships across all global points of sale for Expedia, Inc. As the head of Expedia North America, Brown was responsible for the Expedia points of sale in North America, as well as overseeing Worldwide Travel Exchange, Destination Services, and the Expedia business operations group. Prior to Expedia, Brown was a partner at McKinsey & Company in the global travel and hospitality practice group. Previously, Brown was senior vice president of strategic services with Intercontinental Hotels Group. Paul Brown in now President of Brands & Commercial Services for Hilton Worldwide. He is Hilton's leader for sales, reservations, e-commerce, revenue management and information technology.

72.     In 2008 it was reported, "In the post-9/11 travel slump, hotels were looking for a place to unload their empty rooms at a great price. And it was in that environment that InterActive Corp. Chairman Barry Diller acquired Expedia.com, along with fellow travel discounters Hotels.com and Hotwire. But by 2005, the travel industry was back in full swing, and hotels were less apt to offer such deals. In an effort to let the rest of IAC's business get out from under the "shadow of travel," as he said in an employee memo, Diller responded by spinning the travel sites off as a separate business. The newly public company, Expedia, got started without the best relations with its suppliers. "Hotels.com in particular had taken a relatively aggressive stance with hotel suppliers during this time," says Paul Brown, president of Expedia North America, who

joined the company just after the spinoff." See http://www.businessweek.com/stories/ 2008-09-02/issue-getting-along-with-suppliersbusinessweek-business-news-stock-market-and-financial-advice.

73.     During this time, Paul Brown operated the "partner services group" for Expedia to coordinate issues such as pricing among different Expedia companies and hotels. *Id.*

74.     Brown stated in an interview in "Expedia Packing New Deal With Hyatt; Pushing Partnerships; Online travel company wants to offer travelers plenty of hotel packages" from the May 1, 2006 copy of Investor's Business Daily, "We're focusing on longer-term relationships with these companies. This means longer-term business contracts, so we can focus more of our efforts on what's driving business between us and these hotel partners."

75.     The Investor Business Daily (IBD) interview also revealed that Paul Brown was not concerned about price competition due to price parity. The interview stated,

IBD: Do services like this make consumers more loyal to Expedia?

Brown: We live in a segmented world. All customers aren't the same. Some customers aren't particularly brand-loyal. Some are very brand-loyal and go directly to a supplier's Web site.

IBD: But you think a majority aren't brand-loyal?

Brown: A much larger segment of the population is looking for variety and an objective opinion about the products they buy. This is whether such opinions come from other customers or us. And they're also looking for ease in making these travel selections.

IBD: Is that more important to them than getting the best price?
Brown: **We're living in a world where there's more price parity on travel products, so the search for a better deal doesn't always yield better results.**

IBD: What is Expedia doing to counter those who offer cheaper online travel deals?

Brown: We have something called the **Best Price Guarantee**. If you've booked a trip with Expedia and find a better price online for the exact trip within 24 hours, we'll refund the difference . . . and we'll also give you a $50 travel coupon toward future purchases on Expedia.

76.     Paul Brown's statements provide evidence that corroborate that Expedia uses best price guarantee as a cover up the price-fixing conspiracy supported by "price parity" agreements between Travel Retailers including Expedia and Defendant Travelscape and Hotels and provide evidence that 'Best Price Guarantee" and "Parity" are code word for the fixed price or "memes" used to enforce the fixed price.

77.     Paul Brown admitted that "the search for a better deal doesn't always yield better results" due to price parity.  Yet Brown did not disclose that price parity resulted from RPM scheme using "best price guarantee" and "parity" manipulations not free competition market forces.

78.     The Defendant Retailer-Hotel Agreements are and were part of an overall agreement to impose and enforce the RPM scheme. For example, in 2004, multiple hotels, including Defendants Hilton and Kimpton, and Online Retailers, including Defendant Priceline, met together in Las Vegas for Eye for Travel's second annual Revenue Management and Pricing in Travel conference.  At the conference, Defendants Hilton, Kimpton and Priceline discussed "rate parity" and "pricing strategies." In fact, Jimmy Shu, VP Revenue Management and Distribution at Kimpton led a presentation to "address the issues associated with adapting rate parity across all distribution channels. . . ." Eye for Travel has annually sponsored these conferences, and the attendees have expanded to include nearly all of the Defendants.

79.     For example, Eye for Travel sponsored the World Travel Market and sponsored the "Travel Leadership Forum: Evolution of Online Travel" in 2008 attended by Paul Brown as well as Glen Fogel of Priceline, Marc Charron of Trip Advisor and Greg Webb of Sabre.

80.     As part of the Defendant Retailer-Hotel Agreements, the Hotel Defendants demonstrated their compliance by requiring that competing online retailers agree to raise and maintain retail prices at the Rack Rate. As a further sign of their agreement with the Online Retailer Defendants, in some instances, the Hotel Defendants threatened Online Retailers with legal action and/or refused to allow Online Retailers, such as Skoosh.com, to sell Room Reservations if the Online Retailers refused to price fix and maintain resale prices at the Rack Rate in compliance with the RPM scheme. Further pursuant to their agreement with the Online Retailer Defendants, in some instances, the Hotel Defendants required the wholesalers to stop providing rooms to price-cutting Online Retailers, such as Skoosh.com, if they refused to price fix and maintain resale prices at the Rack Rate.

81.     For example, Skoosh has publicly complained that it tried to sell discounted Room Reservations on its online travel site but was thwarted by the resale price maintenance scheme:

`We were openly discounting and hotels would email, call and threaten legal action,' Skoosh told the BBC. `Either we'd have to raise prices or take the hotels off our list,' said Dorian Harris from Skoosh.

82.     In fact, Skoosh has claimed that the Agreements have "created a Mafia-style atmosphere and an intolerable climate for new businesses. Skoosh has been directly threatened and, in turn, has defended its right to discount hotel prices."

83.     Skoosh published a letter dated August 31, 2010, from its CEO to Online Retailer Defendant and Skoosh's competitor Booking.com, complaining about Booking.com's enforcement of the Defendant Retailer-Hotel Agreements. The letter states, in part:

Both personally, and even as a direct competitor, I was always a fan of Booking.com. Yours was one of the better hotel booking sites I always thought, with some innovative features. However, my rosy picture fast disappeared last winter when Skoosh started being pursued by your business partners insisting that we raise our hotel prices to the same as yours. I'm hoping you can find the time to address some of the points below and restore my faith in your company.
Some background then. Earlier this year we started getting some calls from angry and confused hoteliers insisting that we were selling their rooms too cheaply. I called them back to work out what was going on and they mostly told me that Booking.com had been on to them threatening all sorts of nonsense if they didn't either remove their hotel from Skoosh or force Skoosh to raise its prices.
I wondered how this was all happening so quickly and then I did a little research and found that Booking.com has an active policy of maintaining the same prices for all companies across the internet. I even found a job ad of yours looking for `Rate Parity Associates'. It seems like you've got a whole team out there beavering away to `find any rate inconsistencies between Booking.com and their competitors.' They're doing a good job I have to say. The hoteliers you work with are certainly concerned. One wrote to ask me to close out their hotel on Skoosh: `just to avoid the penalty that [Booking.com] is threatening us about'.
Some were less friendly. Many of the hoteliers wrote letters to me threatening legal action. One of them had a colleague of yours on one line and me on the other. It seemed that your colleague was insisting that if we hadn't removed their hotel from Skoosh by the end of the phone call Booking.com would cancel the contract with them. They were very scared.

84.     The fact that Booking.com has threatened to cut off the sale of Room Reservations for Hotel Defendants that do not enforce the RPM scheme is entirely consistent with the Rate Assured Hotel Program implemented by Booking.com's parent

Defendant Sabre (which also owns Defendant Travelocity). Sabre's Rate Assured Hotel

Program requires the Hotel Defendants to enforce the RPM scheme:

For Suppliers
Sabre Rate Assured™ Hotel Program
Are you Rate Assured?
Sabre Travel Network has already begun measuring properties to validate rate parity
across properties prior to the official launch. So make sure your properties are rate
compliant!
(b) If it is determined that a property is not providing rate parity in the program, it will
essentially be placed on "Probation" status.
(c) If a property is not providing rate parity in the subsequent measurement, Sabre will
consider the hotel "In Violation" . . .

85.     In fact, Sabre, which owns Travelocity and Booking.com, also runs a

division called "Sabre Hospitality Solutions," which expressly markets and encourages

hotels to adopt rate parity — in effect, the RPM scheme. See, e.g., http://

www.sabrehospitality.com/blog/2011-10-27/how-hotels-can-leverage-ota-relationships-

without-killing-their-pricing-strategy; http://www.sabrehospitality.com/blog/2011-11-30/

three-top-trends-in-hospitality-marketing-and-distribution-to-consider-when-planning-

for-2012.

86.     Thus, pursuant to the Defendant Retailer-Hotel Agreements, the Hotel

Defendants are enforcing the RPM scheme on price-cutting competing online retailers.

For example:

a.      Hilton required Skoosh's wholesale supplier in the United States,

AlliedTPro, to entirely cut off its contract with Skoosh as a result of Skoosh's discounting

and Defendant Hilton's enforcement of the Retailer-Hotel Agreements. AlliedTPro wrote

to Skoosh: "Trust me I would welcome the additional business but cannot risk our

contracts with Hilton."

b.      Trump expressly admitted it was enforcing the Defendant Retailer-Hotel

Agreements, emailing Skoosh:

From: [redacted.data] Sent: 10 May 2010 18:27 To: Dorian Harris Subject: RE: New
inquiry was submitted on Skoosh.com
The simple answer is; if we do not maintain parity with all, we are threatened with poor
placement on sites and worst case . . . removal of hotel from sates sites. That is the way
the OTA's operate in USA. Expedia threatens if Travelocity gets lower rate and vice-
versa, it is a vicious cycle if we get out of parity.
I think the model in Europe is built to operate more competitively but that is not the
model here. (Much as I wish it was the same as Europe!) I hope this helps you
understand why we must be strict with what is offered on all websites.
Thanks,
Trump International [redacted.data]

c.      Intercontinental wrote to Skoosh "demanding that Skoosh either raise[] its

rates to the same as the hotels and its other distribution partners (a practice known in

the industry as `rate parity') or remove the hotels entirely from our site."

d.      In 2003, Defendant Marriott announced "a sweeping overhaul of its

transient pricing, bringing parity to all Marriott distribution channels — offline and

online."  Marriott was among the Hotels threatening Skoosh.com with legal action and/or

the withdrawal of their Room Reservations if Skoosh.com did not maintain rate parity.

e.      Starwood enforces the RPM scheme. "In one email to a hotel discounter,

an executive at Starwood, which runs Le Meridien, Westin, W and Sheraton hotels,

said: `Should a wholesaler decide to sell the rooms on a room only basis, he has to

make sure that the per contract agreed minimum mark-up is guaranteed.' The employee

said the `violation' of Starwood's Best Rate Guarantee was `really serious' and the

breach was reported to the Brussels headquarters."

87.      Similarly, Kayak.com, which is a price comparison website, told Skoosh on

several occasions that it had to "play the Orbitz game,"i.e. maintain rate parity, or Kayak

would no longer publish Skoosh's prices. Kayak apparently felt pressured to enforce rate parity on behalf of the Online Retailer Defendants because, for example, Orbitz accounted for 18.8% of Kayak's total revenues and Expedia and its affiliates accounted for 24.9% of Kayak's total revenues for the nine months ended September 30, 2010.[17] After Skoosh reported the RPM scheme to governmental authorities, Kayak stopped publishing Skoosh's prices on its price comparison site.

88.     Each of these actions was taken directly because of the pressure Online Retailers were placing on Hotels to protect the Online Retailer Defendants' margins by enforcing the RPM scheme. The Online Retailer Defendants enforced the RPM scheme because they feared losing access to the Online Retailer Defendants' website to sell their rooms if they did not. As one industry consultant explained:

`I don't know that there's been enough public questioning of this [rate parity] practice,' said Ashwin Kamlani, founder of Hotel Internet Help Inc., which helps independent hotels get more sales via cyberspace. `The hotels enforce rate parity because they fear the consequences of not maintaining rate parity,' he said. `They fear having their hotel dropped to page 6 or even pulled off their largest producing [online travel agents] sites, which translates into a potentially significant loss of revenue.

89.     Blink Booking, a mobile-only hotel booking service, echoed the claims of competing online retailers, saying: "We've long believed that the big online travel agents have been guilty of denying consumers the best prices — and that hotels' hands are tied by price parity agreements. The online travel market may appear to offer plenty of choice and competition, but the reality is that there are lots of different shop windows selling the same rooms at the same prices — with those prices agreed through parity deals between the big groups and the big OTAs [online travel agents]."

90.     The Hotel Defendants knew that the Online Retailer Defendants would enforce the Agreements or refuse to sell the Hotel Defendants' rooms. For example, in 2009, Defendant Expedia refused to list or sell Room Reservations from Choice Hotels. Expedia's CEO and President Dara Khosrowshahi explained:

`. . . As far as the discussions that we've had with Choice, we are not doing business with Choice right now on a chain basis. We don't have a vast majority of Choice hotels on our side,' said Khosrowshahi. . . .

. . . he added, `First of all, our primary goal is to have the broadest, deepest set and highest quality set of inventory for the benefit of our customers. And this doesn't signal any kind of change in our overall philosophy as far as how we work with our hotel partners and what we're looking at. It's not really an issue of economics; it's more than issue of our wanting rate parity and inventory parity for our customers.'
`When our customers come to Expedia, we want them to know that they're getting the best prices and certainly, we are insistent on that. And to the extent that Choice doesn't want to work under those terms. We won't be doing business with each other. Those are the terms that we work with our others strategic partners, they're comfortable where they were comfortable with it. So, its nothing usual from what I would say is typical practice for us inmost of our other OTA competitors so to speak.

91.     Thus, the Retailers sought and received agreements from the Hotel Defendants that they would only sell to Online Retailers who would not discount the Rack Rate for Room Reservations, even if and when it reduced the Hotel Defendants' sales and/or profits by slowing sales of the Room Reservations.

92.     More specifically, the Hotels agreed to work with the Online Retailer Defendants to implement and enforce the RPM scheme to ensure that pricing by competing Online Retailers be restrained.

93.     The Online Retailer Defendants sought and obtained the agreement of the Hotel Defendants to impose and enforce "rate parity" — i.e., restraint on price

competition — solely for the Online Retailer Defendants' benefit and not for any legitimate pro-competitive reason.

94.     The Online Retailer Defendants are driven to maintain their product and profit margins, as their margins are threatened by newer, more efficient internet retailers. That dominant retailers, like the Online Retailer Defendants, would react anti-competitively to threats to their pricing freedom, such as those posed by new or more efficient retailers, has been acknowledged by the United States Supreme Court.

95.     The Supreme Court not only recognized that minimum resale pricing may be imposed by a dominant retailer for that retailer's benefit, but stated that such behavior violates the antitrust laws. Indeed, the Supreme Court cautioned that: [r]esale price maintenance, furthermore, can be abused by a powerful manufacturer or retailer. A dominant retailer, for example, might request resale price maintenance to forestall innovation in distribution that decreases costs. A manufacturer might consider it has little choice but to accommodate the retailer's demands for vertical price restraints if the manufacturer believes it needs access to the retailer's distribution network. See Overstreet 31; 8 P. Areeda & H. Hovenkamp, Antitrust Law 47 (2d ed. 2004) (hereinafter Areeda & Hovenkamp); cf. Toys "R" Us, Inc. v. FTC, 221 F.3d 928, 937-938 (7th Cir. 2000). As should be evident, the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated. Leegin Creative Leather Prods., Inc. v. PKS, Inc., 127 S. Ct. 2705, at 2719-20 (U.S. 2007).

96.     The RPM Scheme has achieved its illegal goal: Online Retailer Defendants do not compete on the basis of price for Room Reservations. Rather, all online sales of Room Reservations for the same rooms are at the Rack Rate.

97.     Deposition testimony of Tim Gordon, Senior Vice President, of Priceline

makes clear that each of the Online Retailer Defendants buys the rooms and sells the

rooms to the public at exactly the same price:

Q. And in fact, sir, lets take a look at ALL22. And this is a printout I did back in
September for a night's stay at the Hilton in San Antonio . . . . $219 rate, taxes and then
a total. And then if you will look through, I've printed out from the various websites of the
defendants, same hotel, same night. Orbitz has its $219.00 rate. Cheap Tickets has its
$219.00 rate. Lowest Fare has a $219.00 rate. Priceline, $219.00 rate. Travel Now,
$219.00. Expedia, $219.00. And Hotels.com, $219.00. Every website lists this room on
this night at the exact same room rate. And you know — you know, based upon the way
the contracts work, that doesn't surprise you, does it?
A. No.
Q. And why doesn't that surprise you?
A. Because in general — and I can't be too specific because I don't know the exact
terms of this agreement, but in general the contracts require us to take a net rate that
they provide and mark it up by a specific amount. And they require us to mark it up by
that amount.
Q. By that exact amount?
A. Yes.
Q. And your understanding is that you have best price guarantee from Hilton where they
can offer your competitors more heavy discounts than they can offer Priceline, correct?
A. That is true.
* * *
Q. All right. And so given the Most Favored Nations Clause that Hilton has, your
understanding would be everybody — all these competitors are being provided this
room at the same price and marking it up by the same amount resulting in the same
retail rate, correct?
A. I believe that to be true.

98.     In fact, a federal court in the Western District of Texas recently commented

on the similarity of the business models and pricing structures of the Online Retailer

Defendants:

After reviewing the record, it is clear that the Defendants not only engage in a common
course of conduct, but that many of their business practices are virtually identical.
These practices include but are not limited to the manner in which they contract with the
Hotel Defendants, the manner in which they determine and assess cancellation policies
and fees, the manner in which they determine the mark up and fees to arrive at an
acceptable margin and retail/sell rate; and, the manner in which they calculate, assess
and pay hotel occupancy taxes. The deposition testimony of the corporate

representatives, standing alone, reflects an amazing similarity in practice, procedure and corporate methodology among all of the [Online Retailer Defendants]. Memorandum and Opinion on Class Certification. City of San Antonio v. Hotels.com, et al, No. SA-06-CA-381-OG (W.D. Tex) (the "San Antonio Class Cert Order") at 18-19 (emphasis added).

99.    The Court determined, based upon deposition testimony, that the margins

of each of the Online Retailer Defendants were identical to the other Online Retailer

Defendants:

Almost without exception, the net rate and sell rate for a given room on a given day are the same among the [Online Retailer Defendants] because the Defendants' agreements with the Hotel Defendants all contain "parity" or "Most Favored Nation" clauses. This also makes the [ITC] margins the same. Id. at 20, n21 (citations to deposition testimony omitted).

100.    This rate parity is demonstrated by examples of hotel rooms available for

reservation on the Online Retailer Defendants' internet sites:

Holiday Inn San Diego on the Bay (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Standard | $186 |
| Hotels.com Standard | $186 |
| Orbitz Standard | $186 |
| Priceline.com Standard | $186 |
| Travelocity.com Standard | $186 |
| Booking.com Standard | $186 |
| Holiday Inn website Standard | $186 |
| Expedia Deluxe | $235 |
| Hotels.com Deluxe | $235 |
| Orbitz Deluxe | $235 |
| Priceline.com Deluxe | $235 |
| Travelocity.com Deluxe | $235 |
| Booking.com Deluxe | $235 |
| Holiday Inn website Deluxe | $235 |

Intercontinental Century City (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Executive Suite | $375 |
| Hotels.com Executive Suite | $375 |
| Orbitz Executive Suite | $375 |

| | |
|---|---|
| Priceline.com Executive Suite | $375 |
| Travelocity.com Executive Suite | $375 |
| Booking.com Executive Suite | $375 |
| Hotel website Executive Suite | $375 |

InterContinental San Francisco (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Deluxe | $333 |
| Hotels.com Deluxe | $333 |
| Orbitz Deluxe | $333 |
| Priceline.com Deluxe | $333 |
| Travelocity.com Deluxe | $333 |
| Booking.com Deluxe | $333 |
| Hotel website Deluxe | $333 |

San Diego Marriott (9/22-9/23) posted 8/7/2012:

| | |
|---|---|
| Expedia Bayview | $240 |
| Hotels.com Bayview | $240 |
| Orbitz Bayview | $240 |
| Priceline.com Bayview | $240 |
| Travelocity.com | $240 |
| Booking.com Bayview | $240 |
| Hotel website | $240 |

LA Marriott Airport (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Deluxe | $119 |
| Hotels.com Deluxe | $119 |
| Orbitz | $119 |
| Priceline.com | $119 |
| Travelocity.com | No listing |
| Booking.com Deluxe | $119 |
| Hotel website | $119 |

Marriott Marquis San Francisco (9/29-9/30) posted 8/7/2012:

| | |
|---|---|
| Expedia Deluxe | $389 |
| Hotels.com Deluxe | $389 |
| Orbitz Deluxe | $389 |
| Priceline.com Deluxe | $389 |
| Travelocity.com Deluxe | $389 |
| Booking.com Deluxe | $389 |
| Hotel website | $389 |
| Expedia City View | $414 |
| Hotels.com City View | $414 |
| Orbitz City View | $414 |
| Priceline.com City View | $414 |

Travelocity.com City View          $414
Booking.com City View              $414
Hotel website                      $414

Hilton San Diego (9/22-9/23) posted 8/7/2012:

Expedia Bay/City View              $185
Hotels.com Bay/City View           $185
Orbitz Bay/City View               $189 (refundable)
Priceline.com Bay/City View        $185
Travelocity.com Bay/City View      $185
Booking.com Bay/City View          $185
Hotel website                      $185

Hilton San Francisco (9/29-9/30) posted 8/7/2012:

Expedia King                       $459
Hotels.com King                    $459
Orbitz King                        $459
Priceline.com King                 $459
Travelocity.com Standard King      $459
Booking.com Standard King          $459
Hotel website                      $459

101.    The same rate parity is demonstrated by looking at examples of hotel

rooms available for reservation on the Online Retailer Defendants' internet sites in

comparison with the www.travelnow.com website used by Travelscape. For example,

Marriot Philadelphia Airport (9-29-9/30) posted 9/6/2012:

Travelscape              $129
Orbitz                   $129
Priceline                $129
Hotels.com               $129
Expedia                  $129
Travelocity.com          $129
Booking.com              $129
Marriott Website         $129

102.    That the rate parity results from the RPM scheme is clear. The Online

Retailer Defendants employ "market managers" who "monitor closely a hotel's rates

across all channels, and if a preferential rate was given to one over the other that hotel could face dire penalties. In fact, as Hotel Defendants started experimenting with price discounting by offering "tiered pricing," the Online Retailer Defendants started to demand Hotel Defendants stop competing with online retailers on price.

103.    An industry expert recounts that Hotel Defendants seeking to promote price discounts in order to have consumers buy directly from the hotel were met with the Online Retailer Defendants demanding price competition cease. According to the industry source, "Hilton, for example, is promoting like crazy to get the customer to book direct. `Book with us and get 500 extra points or free Internet.'" But this competition was unacceptable to the Online Retailer Defendants and contrary to the RPM scheme. "That's where the [Online Retailer Defendants] were forced to become big proponents of rate parity." So the Online Retailer Defendants ensured that the Hotel Defendants could not "undercut," i.e., price compete, by entering into Defendant Retailer-Hotel Agreements and the RPM scheme.

104.    As a result of the "success" of the RPM scheme, the Online Retailer Defendants are confident that all of the prices listed between them for the same room will be identical. Thus, they each offer a near identical "best price" guarantee — knowing it is the only price available even among competitors. Examples follow:

a.    Travelocity's Guaranteed Low Prices

b.     Expedia's Best Price Guarantee

c.    Booking.com Best Price Guarantee

Best Price Guaranteed

We promise that when you book with us, you'll get the lowest possible price for your

room. Guaranteed.

d.      Hotels.com Price Match Guarantee

Price Match
The hotels.com Price Match Guarantee protects your pocket book and takes the worry
out of booking a hotel room After you book with hotel.com, if you find a lower publicity
available rate online for the same dates, hotel, and room category, we will match the
price and refund you the difference.

e.      Orbitz Low Price Gurantee

f.      Travelscape uses "Lowest Hotel Rates Guaranteed" logo below:



        105.    Absent the RPM scheme, the Online Retailer Defendants could not offer

the best price guarantees unless they engaged in price competition and discounted the

Rack Rates.

        106.    The RPM Agreements, and the scheme in restraint of trade, have harmed

competition in the relevant market(s) and caused prices to be higher in the relevant

market(s) then the prices would have been without the Agreements.

        107.    In addition, the uniform adoption and enforcement of "rate parity" and

most favored nation clauses by the Online Retailer Defendants is a horizontal per se

price fixing agreement.

        108.    The Agreements were specifically intended to protect the Defendants from

price competition — both from Hotel Defendants and other highly efficient retailers —

offering the same inventory, Thus, Defendants agreed to restrain competition by

mandating higher price levels and thereby neutering the competition or by eliminating

the price cutting entirely. This scheme achieved its goals, and thereby substantially inflated prices to consumers like Plaintiff.

109. This price-fixing conspiracy is evidently not confined to the United States. The British Office of Fair Trade ("OFT") recently issued a "Statement of Objections" alleging that Expedia, Inc. infringed competition through the very same price fixing agreements with respect to British hotel rooms. The Telegraph reported that Expedia admitted that "it has engaged in cartel conduct on breach of the law," and is "providing information on its rivals under a `leniency deal'" with the British authorities.

110. On July 31, 2012, the OFT issued a Statement of Objections alleging that Booking.com B.V. (Booking.com), Expedia Inc (Expedia) and InterContinental Hotels Group plc (IHG) have infringed competition law in relation to the online supply of room only hotel accommodation by online travel agents. The Statement of Objections alleges that Booking.com and Expedia each entered into separate arrangements with IHG which restricted the online travel agent's ability to discount the price of room only hotel accommodation. The OFT considers that the alleged infringements are, by their nature, anti-competitive in that they could limit price competition between online travel agents and increase barriers to entry and expansion for online travel agents that may seek to gain market share by offering discounts to consumers. The formal investigation was initiated in September 2010, following a complaint submitted by Skoosh, alleging that it was being prevented by various hotel chains from offering discounted sale prices for room only hotel accommodation. The OFT limited the scope of its investigation to a small number of major companies, with a view to achieving a swift and effective

outcome. However, the investigation is likely to have wider implications as the alleged practices are potentially widespread in the industry.

111.    On December 11, 2012, Switzerland's Competition Commission announced that it launched an investigation into the practices of online travel agencies, including Booking.com and Expedia. The Swiss stated that the "best price guarantee" might act as a restriction on competition.

112.    The international scope of the conspiracy is not surprising. Paul Brown was in charge of managing supplier relationships across all global points of sale for Expedia during the time that the conspiracy developed. Paul Brown is now President, Brands & Commercial Services for Hilton Worldwide. In September of 2011, Paul Brown said Hilton Worldwide would take "calculated steps and provide amplified resources in 2012 to assure its product is represented and sold appropriately across all channels at the the PhoCusWright Conference speaking to an audience of 1,400—many of whom represented third-party intermediaries that either negotiate for discounts on Hilton's product or offer feedback forums for its customers." http://www.hotelnewsnow.com/Articles.aspx/6993/Hilton-takes-steps-to-level-OTA-playing-field.

113.    Brown warned the audience of third-party sellers that "Hilton won't reward guests who complain on third-party reviews sites and promised an aggressive deployment of capital to get Hilton's family of websites on pace with third-party sites." Brown said his experience gained at Expedia (he was president of the North American division from January 2005 to December 2008) helped him persuade others within Hilton, particularly hotel owners, to invest in tools that will help level the pricing and distribution playing field. Hilton is in the process of rolling out a corporately funded field-

based revenue management team of about 250 employees to assist individual properties with revenue management. The goal, Brown said, is to take the onus off operators to navigate a complex set of distribution channels and instead let them focus on providing great hospitality. Admittedly, Brown said the program will closely resemble the internal market management group he helped build at Expedia."
http://www.hotelnewsnow.com/Articles.aspx/6993/Hilton-takes-steps-to-level-OTA-playing-field. Brown essentially extolled the hotel industry to compete on quality but not to compete on price.  In Brown's business model, local managers should only be focused on quality not on revenue management.  This model allows price will be determined and fixed by executive management and permits the price-fixing conspiracy to continue and not be undercut by local hotel managers that are not part of the price-fixing conspiracy.

114.	Circumstantial evidence suggests that Paul Brown's army of 250 Hilton Worldwide field-based revenue managers are tasked with enforcing the "best price guarantee" and "parity" agreements that Hilton has with Travel Retailers such as Expedia, Brown's former employer. Brown stated at PhoCusWright in 2011, that "best rates" means prices "should not be worse than or sometimes better than we find through other channels".   Brown also discussed his goal to limit rate autonomy and price discretion exercised by local hotel property managers. Brown will try to remove price responsibility from all local managers of properties through the Hilton Worldwide funded team created by Brown.

115.	On June 25, 2012, Hotel News Now reported that "If you ask any revenue manager whether they practice rate parity or any pricing consultant whether they advise

their clients to practice rate parity, the answer is without-a-doubt 'yes.' Why? Because if there is a public rate out there that doesn't jibe with the rate made available to all other channels, there will be consequences to be paid. Online-travel agencies and franchisors today monitor closely a hotel's rates across all channels, and if a preferential rate was given to one over the other that hotel could face dire penalties. 'If you're out of rate parity the franchisor will fine you $75 to $150. On the second offense they take you off of the (central reservations system),' said Max Starkov, president and CEO at Hospitality eBusiness Strategies. "They take you off the CRS and send lawyers after you. After you acknowledge you've been wrong, they will reinstate you for $5,000. 'That's how the franchisors are enforcing rate parity.'" See www.hotelnewsnow.com/Articles.aspx/8459/Does-rate-parity-limit-revenue-managers?

116.    These facts and recent British and Swiss revelations leave no room for doubt: Expedia and Expedia Companies including Travelscape and the other Online Retailer Defendants are entering into contracts with Hilton and the other Hotel Defendants such as Marriott in this country and to the same anti-competitive effect. The Agreements are part of an anti-competitive scheme under which the Online Retailer Defendants leverage their substantial market power and dominance to induce the Hotel Defendants into agreeing to do one or more of the following: (a) impose minimum resale price maintenance agreements on completing Online Retailers; (b) enforce the price maintenance agreements as to the Online Retailers; and/or (c) cut off supply to price-cutting Online Retailers.

117.    In sum, the Hotel Defendants did not and are not simply or unilaterally:

a. refraining from selling to uncongenial retailers;

b. suggesting resale prices that were widely followed;

c. sanctioning, terminating or refusing to sell to retailers who failed to maintain a minimum resale price;

d. announcing and enforcing policies of sanctioning, terminating or refusing to sell to retailers who failed to maintain a minimum resale price; or

e. sanctioning, terminating or refusing to sell to other retailers following, or in response to, complaints by retailers such as the Online Retailer Defendants.

118.    Rather, the Agreements represent a conscious commitment to a common scheme, designed to achieve an unlawful objective, between the Online Retailer Defendants, the Hotel Defendants (including Intercontinental), and other online retailers.

119.    The Hotel Defendants did not act unilaterally or independently, or in their own economic interests, when:

a.    entering into the Defendant Retailer-Hotel Agreements;

b.    seeking online retailers' acquiescence to, and compliance with, the terms of the Hotel-Online Retailer Agreements;

c.    seeking to have retailers charge minimum resale prices; or

d.    terminating or refusing to sell to online retailers for violating the Agreements. In fact, absent threatened penalties or sanctions by the Online Retailer Defendants, it would not be in the Hotel Defendants' economic interest to enter into, maintain, or enforce the Agreements.

120.    The relevant product market in this case is retail sales of Room Reservations by Online Travel Retailers through online and telephone bookings.

121.    The relevant geographic market in this case is the United States.

122.     By virtue of their power to control prices and exclude competition in the relevant market(s), the Online Retailer Defendants at all relevant times possessed monopoly power in the relevant market(s). The Online Retailer Defendants and their subsidiaries hold over a 50 percent market share in the internet travel business market. Just Expedia and its subsidiaries alone account for approximately 50% of the internet travel business market. Moreover the Online Retailer Defendants possess a dominant share of the market(s) for online retail sales of Room Reservations.

123.     The overall effect of Defendants' anti-competitive, exclusionary scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced Room Reservations. As alleged above, had the Defendants not improperly foreclosed or stifled actual or potential competitors from competing in the market for Room Reservations, other actual or potential rival retailers would have achieved much greater sales than they actually did (or threatened to do), given the lower prices that they charged (or could have charged upon entry), and would have posed a far greater competitive threat to the Defendants. Additionally, absent the Defendants' exclusionary conduct, barriers to entry to the market would have been lower, which: (a) would have made it easier for existing or new competitors to enter or expand their positions in the market for Room Reservations, and (b) would have caused existing or potential competitors to be attracted to the Room Reservation market because of the supra-competitive prices that the Defendants were charging. As a result, absent the Defendants' misconduct, the Defendants would have rationally perceived that there was a greater threat of potential competition in the relevant market if the Defendants did not reduce their supra-competitive prices.

124.    The presence of unfettered competition from actual or potential competitors, which were selling lower-priced Room Reservations, would have forced the Defendants to lower the prices for their Room Reservations in order to remain competitive and/or to counter a perceived threat of additional entry.

125.    During the relevant period, Plaintiff and the other members of the Class purchased Room Reservations directly from the Defendants. As a result of the Defendants alleged illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the Room Reservations they purchased. Plaintiff would have been able to, inter alia, purchase less-expensive Room Reservations had potential competitors been able to engage in unfettered competition. The prices that Plaintiff and the other Class members paid for Room Reservations during the Class Period were substantially greater than the prices that Plaintiff and the Class members would have paid absent the illegal conduct alleged herein because: (1) the prices of all Room Reservations were artificially inflated by the Defendants' illegal conduct; and (2) Class members were deprived of the opportunity to purchase Room Reservations from the Defendants' competitors at substantially lower prices. Thus, Plaintiff and the Class have, as a consequence, sustained substantial damages in the form of overcharges.

## VI. AGENTS AND CO-CONSPIRATORS

126.    Various other persons, firms and corporations, not named herein as Defendants have participated as co-conspirators with the Defendants and have performed acts and made statements in furtherance of the conspiracy. Some of these firms are as yet unidentified. The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or

representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

127.   Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

128.   Whenever this complaint refers to an act, deed or transaction of a corporation or entity, the complaint is alleging that the corporation or entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation or entity's business or affairs.

## VII. CLASS ALLEGATIONS

129.   Pursuant to Rule 23 of the Federal Rules Of Civil Procedure, Plaintiff bring this class action on behalf of herself and all members of the following class (the "Class"):

All persons and entities throughout the United States who paid for a room at a Defendant Hotel reserved through Travelscape. Expressly excluded are (i) room reservations made as part of a package deal; or (ii) room reservations made without disclosure of the name of the hotel until after paying for the room reservation.

Pursuant to Rule 23 of the Federal Rules Of Civil Procedure, Plaintiff brings this class action on behalf of themselves and all members of the following subclass (the "Tax Recovery and Service Fee Class"):

All persons and entities who were charged a bundled Tax Recovery Charge and Service Fee by Travelscape LLC.

130.    Plaintiff believes that the Class and SubClass include thousands of consumers and businesses across the United States, though the exact number and the identities of the Class members are currently unknown.

131.    The members of the Class and SubClass are so numerous that joinder of all Class members is impracticable.

132.    Common questions of law and fact exist as to all members of the Class and SubClass and predominate over any questions affecting solely individual members of the Class and SubClass. Nearly all factual, legal, and statutory relief issues raised in this Complaint are common to each of the members of the Class and SubClass and will apply uniformly to every member of the Class and SubClass. Among the questions of law and fact common to Class and SubClass members are:

a.      whether Defendants engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition and limiting purchaser access to competing and lower-priced Room Reservations;

b.      whether Defendants unreasonably restrained trade;

c.      whether Defendants' anti-competitive contracts, combinations, and conspiracies have caused Plaintiff and the other members of the Class to suffer antitrust injury in the nature of overcharges;

d.      whether Defendants' unlawful conduct caused Plaintiff and other Class members to pay more for the Room Reservations than they otherwise would have paid;

e.      the appropriate Class-wide measure of damages;

f.      whether, and in what amount, Plaintiff and the other Class and SubClass members are entitled to recover treble damages, court costs, and attorneys' fees;

g.      whether Defendants' anti-competitive conduct is continuing, thus entitling the Class and SubClass to injunctive relief to promote unrestrained trade and free and fair competition.

h.      whether Defendant Travelscape LLC violated the Washington Consumer Protection Act by committing the deceptive business practices alleged herein;

i.      whether Defendant Travelscape's assessment and collection of the "Taxes & service fees" amounts to conversion of Plaintiff's and the SubClass' property;

j.      whether Plaintiff and the SubClass are entitled to damages and the imposition of a constructive trust, and whether permanent and/or preliminary injunctive relief should be issued as a result of Defendants' unlawful conduct; and

k.      whether, and in what amount, Plaintiff and the other SubClass members are entitled to recover treble damages, court costs, and attorneys' fees.

133.    Plaintiff's claims are typical of the claims of other members of the Class and SubClass because Plaintiff and every member of the Class and SubClass have suffered similar injuries as a result of the same practices alleged herein. Plaintiff has no interest adverse to the interests of the other members of the Class and SubClass.

134.    Plaintiff will fairly and adequately represent and protect the interests of the Class and SubClass. Plaintiff has retained able counsel with extensive trial experience and legal experience in class action and consumer litigation. The interests of Plaintiff are coincident with, and not antagonistic to, the interests of the other Class and SubClass members.

135.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

136.     Plaintiff and other members of the Class have suffered damages as a result of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants will retain substantial funds received as a result of their wrongdoing. Absent a class action, the members of the Class will not be able to effectively litigate these claims and will suffer further losses, as Defendants will be allowed to continue such conduct with impunity.

137.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Moreover, because the damages suffered by individual members of the Class are relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. The Class is readily definable, and prosecution of this action as a class action will eliminate the possibility of repetitious litigation. There will be no difficulty in the management of this action as a class action.

**VIII. TOLLING OF THE STATUTE OF LIMITATIONS, FRAUDULENT CONCEALMENT, EQUITABLE TOLLING AND CONTINUING VIOLATIONS**

138.     Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon herein until immediately prior to commencing this civil action.

139.     Any applicable statutes of limitation have been tolled by Defendants' affirmative acts of fraudulent concealment and continuing misrepresentations, as the facts alleged above reveal.

140.     Because of the self-concealing nature of Defendants' actions and their affirmative acts of concealment, Plaintiff and the Class assert the tolling of any applicable statutes of limitations affecting the claims raised herein.

141.     Defendants continue to engage in the deceptive practice, and consequently, unwary consumers are injured on a daily basis by Defendants' unlawful conduct. Therefore, Plaintiff and the Class submit that each instance that Defendants engaged in the conduct complained of herein and each instance that a member of the Class purchased a Room Reservation constitutes part of a continuing violation and operates to toll the statutes of limitation in this action.

142.     Defendants are estopped from relying on any statute of limitations defense because of their unfair or deceptive conduct.

143.     Defendants' conduct was and is, by its nature, self-concealing. Still, Defendants, through a series of affirmative acts or omissions, suppressed the dissemination of truthful information regarding their illegal conduct, and have actively foreclosed Plaintiff and the Class from learning of their illegal, anti-competitive, unfair and/or deceptive acts.

144.     By reason of the foregoing, the claims of Plaintiff and the Class are timely under any applicable statute of limitations, pursuant to the discovery rule, the equitable tolling doctrine, and fraudulent concealment.

**COUNT I**
**VIOLATION OF 15 U.S.C. § 1**
**(AGREEMENTS UNREASONABLY RESTRAINING TRADE)**

145.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

146.    The Agreements, and their enforcement, constitute contracts, combinations and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiff and the Class thereby.

147.    The Agreements cover a sufficiently substantial percentage of relevant market(s) to harm competition.

148.    The Defendants are liable for the creation, maintenance, and enforcement of the Agreements under a per se, "quick look" and/or rule of reason standard.

149.    The Defendants possess market power.

150.    The Agreements harm competition by artificially raising and stabilizing prices.

151.    There is no legitimate, pro-competitive business justification for the Agreements or any of them that outweighs their harmful effect. Even if there were some conceivable justification, the Agreements are broader than necessary to achieve such a purpose.

152.    Plaintiff and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Defendants' substantial foreclosure and exclusion of competition in the relevant market(s).

153.     Without limiting the generality of the foregoing, Plaintiff and the other members of the Class have been forced to pay higher prices for Room Reservations than they would have paid in the absence of Defendants' unlawful conduct.

WHEREFORE, Plaintiff, Eileen Gillespie, on her behalf and on behalf of the Class, prays for judgment, as follows:

A.     For an Order certifying this case as a class action against Defendants;

B.     For money damages against Defendants and in favor of Plaintiff and the Class on all claims asserted in this Complaint;

C.     For costs of suit incurred herein;

D.     For prejudgment interest to the extent allowed by law;

E.     For penalties as allowed by law;

F.     For permanent injunctive relief to enjoin further violations of the law; and

G.     For such other and further relief as this Court may deem just and proper.

**COUNT II**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT AGAINST DEFENDANT TRAVELSCAPE LLC ON BEHALF OF THE SUBCLASS**

154.     The preceding allegations are re-alleged and incorporated by reference as if fully set forth herein.

155.     Plaintiff and the SubClass are persons within the meaning and coverage of the Washington Consumer Protection Act ("CPA"), RCW 19.86.

156.     The Washington Consumer Protection Act provides:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of commerce are hereby declared unlawful. RCW 19.86.020.

157.    The Washington Consumer Protection Act also provides:

Every contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is hereby declared unlawful. 19.86.030.

158.    Defendant injured Plaintiff and the SubClass in their business or property by a violation of RCW 19.86.020 of 19.86.030.

159.    Defendant Travelscape charged Plaintiff and the Subclass for a bundled "Tax Recovery Charge and Service Fee" in violation of 19.86.020 in combination with a rate overcharge in violation of of 19.86.030.

160.    Based on the material facts alleged above, Defendants' conduct injured Plaintiff and the other members of the SubClass in their business and property within the meaning of the CPA. Defendants' conduct occurred in the conduct of trade or commerce.

161.    By unlawfully devising, calculating, charging and collecting the "Taxes & service fees" charge, Defendants have intended that Plaintiff and the other members of the Class rely on the legitimacy of such a charge.

162.    Defendants' acts and practices impact the public interest, and have the capacity to deceive a substantial portion of the public. The acts are committed in the course of Defendants' business; the acts are part of a pattern or generalized course of business; the acts were committed repeatedly prior to the acts involving Plaintiff; there is a real and substantial potential for repetition of Defendants' conduct after the acts involving Plaintiff; and many consumers are affected or likely to be affected.

163.    Defendants' unfair acts of devising, calculating, charging and collecting the "Taxes & service fees" charge and rate overcharges have directly, foreseeably, and

proximately caused damages to Plaintiff and the other members of the Class, and is in

violation of the CPA, making such deceptive acts and practices illegal and requiring

injunctive relief.

WHEREFORE, Plaintiff, Eileen Gillespie, on her behalf and on behalf of the

SubClass, prays for judgment, as follows:

A.  For an Order certifying this case as a class action against Defendant Travelscape and appointing Plaintiff as Representative of the SubClass and her counsel as SubClass counsel;

B.  For money damages against Defendants and in favor of Plaintiff and the SubClass;

C.  For disgorgement and restitution plus interest due thereon at the legal rate and/or as established by each Class members' transient occupancy taxes;

D.  For costs of suit incurred herein;

E.  For prejudgment interest to the extent allowed by law;

F.  For penalties as allowed by law;

G.  For preliminary and permanent injunctive relief to enjoin further violations of the law; and

H.  For such other and further relief as this Court may deem just and proper.

Plaintiff,
Eileen Gillespie

__/s/_Mark_T._Lavery_____
By Hes Attorney

| Mark Lavery | Christopher V. Langone |
|---|---|
| Lavery Law Firm | Langone Law Firm |
| 733 Lee, Suite 202 | 207 Texas Lane |
| Des Plaines, IL 60016 | Ithaca, NY 14850 |
| 847-813-7771 | 607-592-2661 |